**F I L E D**

**UNITED STATES COURT OF APPEALS**

**April 4, 2006**

**TENTH CIRCUIT**

_____

JAMES WILLIAM HILL,

    Plaintiff-Appellant,

v.

MR. FLEMING (Lieutenant); E.J.
GALLEGOS (Warden); C. GOMEZ
(Captain); MR. BEHRENS (Lieutenant);
MR. WILSON (Lieutenant); MR.
HANCOCK (Lieutenant); MR.
GALLATY (Lieutenant); DR. BAILEY
(Psychologist); MS. HOLINKA
(Associate Warden); MR. G. CLARK
(Unit Manager); MR. F. OWENS (Unit
Counselor),

    Defendants-Appellees.

No. 04-1166
(D. Colo.)
(D.Ct. No. 02-F-2438 (PAC))

_____

**ORDER AND JUDGMENT**[*]

_____

Before **HARTZ**, Circuit Judge, and **McWILLIAMS** and **BRORBY**, Senior
Circuit Judges.

_____

    Appellant James William Hill appeals the district court's grant of summary

_____

[*] This order and judgment is not binding precedent except under the
doctrines of law of the case, *res judicata* and collateral estoppel. The court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

judgment in favor of the Appellees, officials of the Federal Bureau of Prisons, on his 42 U.S.C. § 1983 action alleging the conditions and duration of his 399-day administrative detention, together with the federal prison regulations in 28 C.F.R. § 541.22, created a liberty interest triggering procedural due process protections which the prison officials violated. Exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

## I. Background

We begin with the undisputed facts relevant to Mr. Hill's § 1983 action and summary judgment disposition. Mr. Hill is serving an eighty-four month sentence with the Federal Bureau of Prisons for distribution of cocaine base and from September 29, 2000, until March 14, 2002, was confined at the Federal Correctional Institution in Florence, Colorado. On February 16, 2001, prison officials placed Mr. Hill in a dry cell on suspicion he ingested narcotics; they then issued an order advising he would remain in the dry cell until they determined whether he introduced narcotics into the institution. The next day, February 17, 2001, prison officials recovered from Mr. Hill's feces two balloons which contained marijuana. Prison officials then suspended preparation of a disciplinary report against Mr. Hill pending an investigation by the Federal Bureau of Investigation for possible criminal prosecution and placed Mr. Hill in

administrative detention pending the investigation, as required under 28 C.F.R. §§ 541.14(b)(1) and 541.22.

Almost one year later, on January 9, 2002, the Federal Bureau of Investigation declined to prosecute Mr. Hill on drug charges and released the discipline report for processing.[1] Six days later, on January 15, 2002, a prison disciplinary officer held a hearing on the charges in the report, found Mr. Hill violated a prison offense code for possession of narcotics, and recommended a disciplinary transfer. Mr. Hill remained in administrative detention until his disciplinary transfer to another institution on March 14, 2002. In total, Mr. Hill spent 399 days in administrative detention at the Florence facility.[2]

A factual dispute arises over the conditions of Mr. Hill's administrative detention. First, in his verified and sworn complaint, Mr. Hill alleged officials

---

[1] While Mr. Hill cursorily complains on appeal about the length of time it took to investigate the incident, the § 1983 action in this case is against the named prison officials and not the agents of the Federal Bureau of Investigation who conducted the one-year investigation of which he now complains.

[2] Mr Hill, in his *pro se* complaint, and the federal magistrate judge calculated Mr. Hill's confinement at 391 days, while we and Mr. Hill's counsel calculate it at 399 days. Although sixty days of this confinement occurred after Mr. Hill's hearing for narcotics possession and prior to his disciplinary transfer, neither party suggests the sixty days not be considered for summary judgment purposes.

confined him to his cell twenty-four hours a day except for one hour of exercise each day, five days a week. He further alleged officials denied him sick calls; educational, work and visitation privileges; and use of the telephone, commissary, law and other library, and recreation area available to inmates in the general population. In contrast, prison officials generally claimed the conditions in administrative detention are "as close to those in the general population as possible, with the large exception of keeping the inmates separated from others for security purposes," and pointed out prison regulations prescribe the conditions for inmates in administrative detention, which include five hours of recreation a week and privileges to make telephone calls, send and receive mail, participate in educational and religious activities in their cells, and retain a certain amount of personal property. *See* 28 C.F.R. §§ 540.16, 540.50, 540.100, 541.21(c)(6), and 541.22(d). However, the officials did not explicitly state Mr. Hill himself experienced the same conditions prescribed in the regulations or in comparison with other inmates in either administrative detention or the general prison population. Prison officials also did not submit evidence showing 399 days in administrative detention is typical.

With respect to procedural due process, Mr. Hill alleged he filed an administrative grievance complaining prison officials denied him periodic review

-4-

hearings and psychiatric or psychological assessments required by 28 C.F.R. § 541.22(c). He claimed he withdrew his grievance when a prison official summoned him to his office, told him segregation review officers were "in trouble" for failing to provide him the required monthly hearings, and if he did not drop his grievance, the Federal Bureau of Investigation would reconsider its decision not to criminally prosecute him and cause him to remain in administrative detention for several more months. In response, prison officials claimed, by declaration and through submission of periodic review forms, that Mr. Hill received three-day, seven-day, weekly and thirty-day reviews, as well as psychological assessments, as required by § 541.22(c), for the time period in question. In both his verified complaint and *pro se* response to the prison officials' motion for summary judgment, Mr. Hill alleged prison employees simply slipped informal review forms under his cell door, denying him an opportunity to be heard during any of the reviews; he also alleged he never received the psychiatric assessments referenced in the psychological reviews submitted.

Following briefing on the prison officials' motion for summary judgment, a magistrate judge determined, and the district court agreed, Mr. Hill raised facts in his verified complaint sufficient to establish a dispute of facts over whether

officials created a liberty interest triggering Fifth Amendment procedural due process rights which the officials denied. Nonetheless, the district court granted summary judgment in favor of the prison officials on the grounds of qualified immunity, holding Mr. Hill failed to show a constitutional or statutory right was clearly established when the alleged violation occurred.

This appeal followed, in which we appointed counsel for Mr. Hill. On appeal, Mr. Hill contests the district court's summary judgment decision, reiterating his contention the atypical conditions and duration of his confinement, together with the prison regulations prescribed in 28 C.F.R. § 541.22(c), created a liberty interest which triggered procedural due process protections which the prison officials violated. He also argues these same officials are not entitled to qualified immunity because the law creating a liberty interest and the requisite procedural due process protections was clearly established at the time of his confinement.

## II. Discussion

### A. Summary Judgment Standard of Review

To begin, we review *de novo* the district court's summary judgment decision, examining the record and drawing all reasonable inferences in the light

most favorable to the non-moving party. *See Palladium Music, Inc. v. EatSleepMusic, Inc.*, 398 F.3d 1193, 1196 (10th Cir. 2005). Summary judgment is appropriate if the record shows there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Id.* (relying on Fed. R. Civ. P. 56(c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). In reviewing summary judgment motions, we look at the parties' respective burdens. Concerning claims of individual liability, movants for summary judgment bear the initial burden of demonstrating the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir. 1998). If this initial burden is carried, the nonmovant may not rest solely on his pleadings, but must set out specific facts in support of his claims by reference to affidavits, deposition transcripts or other exhibits incorporated therein. *Id.* at 671. We have held a verified complaint stating facts admissible at trial and based on personal knowledge has the same force and effect as an affidavit for the purpose of responding to a motion for summary judgment. *See Conaway v. Smith*, 853 F.2d 789, 792 (10th Cir. 1988).

We apply the burdens of the parties differently on claims of qualified immunity. *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1311 (10th Cir. 2002). "When a § 1983 defendant raises the defense of qualified immunity on summary

judgment, the burden shifts to the plaintiff to show that 1) the official violated a constitutional or statutory right; and 2) the constitutional or statutory right was clearly established when the alleged violation occurred." *Id.* at 1311-12 (citation omitted). To determine whether the right was clearly established, "[t]he relevant, dispositive inquiry ... is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 533 U.S. 194, 202 (2001). In considering summary judgment determinations, we may affirm the district court's grant of summary judgment for any reason supported by the record. *See Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005).

## B. Liberty Interest Decisions

In the instant case, the parties rely on a bevy of Tenth Circuit published and unpublished cases, as well as other circuit cases, to discern the applicable law with respect to the administrative detention at issue, the liberty interest created, and the degree of procedural due process to be afforded Mr. Hill. However, based on the dispute of material facts identified by the district court, we deem it inappropriate under the circumstances to grant summary judgment on the issue of whether a liberty interest exists implicating procedural due process guarantees.[3]

---

[3] In cases where we found insufficient evidence in the record to make a determination concerning the conditions or duration of administrative detention,
(continued...)

However, for the purpose of resolving the issue of qualified immunity, we provide a cursory examination of the cases cited by the parties to assess whether the district court correctly concluded the constitutional or statutory right at issue was not clearly established when the alleged violation occurred.  *See Olsen*, 312 F.3d at 1312.

To begin, it is well-established lawfully incarcerated persons, like Mr. Hill, retain only a "'narrow range of protected liberty interests.'"  *Abbott v. McCotter*, 13 F.3d 1439, 1442 (10th Cir. 1994) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)).  The Supreme Court has determined "[t]he Due Process Clause standing alone confers no liberty interest in freedom from state action taken within the sentence imposed."  *Sandin v. Conner*, 515 U.S. 472, 480 (1995) (quotation marks and citation omitted).  Generally, "the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of

---

[3](...continued)
we remanded the evidentiary issue to the district courts.  *See Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002); *Perkins v. Kan. Dep't of Corr.*, 165 F.3d 803, 809 (10th Cir. 1999); *Jones v. Orth*, 242 F.3d 389, 2000 WL 1854015, at *2 (10th Cir. Dec. 19, 2000) (unpublished op.); *Chappell v. McKune*, 132 F.3d 42, 1997 WL 787184, at *2 (10th Cir. Dec. 24, 1997) (unpublished op.); *Clemmons v. Thomas*, 86 F.3d 1166, 1996 WL 282304, at *4 (10th Cir. May 29, 1996) (unpublished op.).  In this case, we are able to make a summary judgment determination on the issue of qualified immunity.

confinement ordinarily contemplated by a prison sentence," and therefore, "administrative segregation is the sort of confinement ... inmates should reasonably anticipate receiving at some point in their incarceration," and does not involve an interest independently protected by the Due Process Clause. *Hewitt,* 459 U.S. at 468. Nevertheless, pursuant to the Supreme Court's decision in *Sandin*, the government may create a liberty interest protected by the Due Process Clause, but this interest is generally limited to freedom from restraint that "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484. It is important to note that under *Hewitt* and prior to *Sandin*, "the analysis of whether a prisoner was deprived of a liberty interest focused not on the nature of the deprivation experienced by the prisoner, but on the language of the applicable prison regulations and whether such language was 'mandatory.'" *Beverati v. Smith*, 120 F.3d 500, 503 n.3 (4th Cir. 1997) (relying on *Sandin*, 515 U.S. at 479-81). "The Supreme Court mandate since *Sandin* is that henceforth we are to review ... liberty interest claims arising from prison conditions by asking whether the prison condition complained of presents 'the type of atypical, significant deprivation in which a State might conceivably create a liberty interest.'" *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) (quoting *Sandin*, 515 U.S. at 486).

In determining whether an atypical deprivation has occurred, we acknowledge most of our decisions are unpublished and provide little analysis; however, like the parties on appeal, we consider them for the purpose of determining the existing law on which prison officials could rely at the time of Mr. Hill's confinement. While we generally disfavor reliance on unpublished decisions, such reliance is appropriate where, like here, they provide persuasive value with respect to a material issue not fully addressed in a published decision and they assist in our disposition of the issues at hand. 10th Cir. R. 36.3(B).

To begin, it is clear this court examines the nature of the deprivation by considering the conditions of confinement, including both the duration and degree of restrictions of that confinement, as compared with other inmates.[4] *See Perkins*, 165 F.3d at 809. When considering whether the conditions, duration or restrictions are atypical as compared with other inmates, we have considered as a baseline whether the segregation at issue mirrors that imposed on other inmates *in the same segregation*,[5] while at other times we have made comparisons with the

---

[4] Although this is not an issue presented on appeal, another consideration in determining if a liberty interest is created is whether the detention increased the length or duration of the sentence imposed. *See generally Wilson v. Jones*, 430 F.3d 1113, 1120-21 (10th Cir. 2005)*; Gaines*, 292 F.3d at 1225 (relying on *Sandin*, 515 U.S. at 487); *Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998).

[5] *See, e.g., Gaines*, 292 F.3d at 1226 (remanding on grounds the district

(continued...)

*general prison population.*[6]  Other circuits grappling with the same baseline issue

have had mixed results,[7] either relying squarely on comparisons with other

inmates in the same *administrative segregation*[8] or those in the *general*

*population.*[9]  In this case, despite the parties' opposing contentions on which

baseline applies, the result is the same, no matter which baseline is used.  We

---

[5](...continued)
court should examine conditions of confinement and suggesting inquiry is whether the segregated inmate's conditions mirror those of other inmates in administrative segregation); *Blum v. Fed. Bureau of Prisons*, 189 F.3d 477, 1999 WL 638232, at *3 (10th Cir. Aug. 23, 1999) (unpublished op.) (concluding conditions in disciplinary confinement did not differ in significant degree with those of other inmates, with inference towards comparison with others in similar segregation).

[6] *See, e.g., Penrod v. Zavaras*, 94 F.3d 1399, 1407 (10th Cir. 1996) (basing its determination, in part, on fact inmates in administrative segregation, *while living in more restrictive conditions*, received "all of the same privileges as the general population inmates"); *Villarreal v. Harrison*, 201 F.3d 449, 1999 WL 1063830, at *2 (10th Cir. Nov. 23, 1999) (unpublished op.) (concluding conditions were not dramatically different from those in the general population).

[7] *See Wilkinson v. Austin*, ___ U.S. ___, 125 S. Ct. 2384, 2394 (2005) (discussing but not deciding disagreement between circuits on using baseline comparisons involving either administrative detention populations or general prison populations); *Skinner v. Cunningham*, 430 F.3d 483, 486-87 (1st Cir. 2005) (noting disagreement between circuits on baseline comparisons).

[8] *See Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000); *Hatch v. District of Columbia*, 184 F.3d 846, 857-58  (D.C. Cir. 1999); *Colon v. Howard*, 215 F.3d 227, 231 (2d Cir. 2000); *Jones v. Baker*, 155 F.3d at 813 (6th Cir.); *Griffin v. Vaughn*, 112 F.3d 703, 706 & n.2 (3d Cir. 1997).

[9] *See Beverati*, 120 F.3d at 504 (4th Cir.); *Keenan v. Hall*, 83 F.3d 1083, 1089 (9th Cir. 1996).

reach this conclusion because regardless of which baseline we previously applied in making comparisons — either segregated or general prison populations — this circuit has never held the conditions, duration or restrictions of the detentions presented on appeal created a liberty interest, even in circumstances where the detention exceeded the 399-day duration of Mr. Hill's detention or restricted some of the same privileges. *See, e.g.*, *Thomas v. Gunja*, 110 Fed. Appx. 74, 75-76 (10th Cir. Sept. 14, 2004) (unpublished op.) (ruling transfer to a restrictive unit of another prison did not create atypical circumstance for purpose of creating a liberty interest); *Weatherall v. Scherbarth*, 208 F.3d 228, 2000 WL 223576, at **1-2 (10th Cir. Feb. 28, 2000) (unpublished op.) (finding no liberty interest in reclassification into administrative segregation); *Blum*, 1999 WL 638232, at *3 (considering disciplinary detention and concluding ninety-day confinement without store privileges, radio, and phone calls as enjoyed by other inmates in segregation did not differ in significant degree and duration to create a protected liberty interest); *Villarreal*, 1999 WL 1063830, at *2 & n.1 (upholding summary judgment decision explaining two-year duration of administrative detention, even with conditions involving restricted telephone privileges and eating alone in cell, did not establish conditions dramatically different from those in the general population); *Chappell v. McKune*, 201 F.3d 447, 1999 WL 1079618, at *1 (10th Cir. Nov. 30, 1999) (unpublished op.), *aff'g* 1999 WL 381802, at *2 (D. Kan. May

-13-

26, 1999) (affirming district court decision on summary judgment which held inmate's lengthy stay of approximately 1000 days in administrative segregation was not atypical given inmate received all the privileges and incentives commensurate with his same security level); *Gutierrez v. Shanks*, 153 F.3d 727, 1998 WL 380958, at *2 (10th Cir. July 9, 1998) (unpublished op.) (instructing in a motion to dismiss case that administrative segregation for over one year was not sufficient to distinguish confinement from that of other inmates for the purpose of creating a liberty interest); *Klein v. Coblentz*, 132 F.3d 42, 1997 WL 767538, at *3 (10th Cir. Nov. 19, 1997) (unpublished op.) (deciding 584-day administrative segregation failed to raise due process issue for summary judgment purposes); *Jones v. Fields*, 104 F.3d 367, 1996 WL 731240, at **1-2 (10th Cir. Dec. 20, 1996) (unpublished op.) (holding fifteen-month administrative segregation did not impose atypical and significant hardship on inmate for purpose of summary judgment disposition).

Other circuits have also largely held no liberty interest arose in administrative detentions presented on appeal — even in situations where the conditions were worse or the duration longer than in Mr. Hill's case. *See, e.g.*, *Jones v. Baker*, 155 F.3d at 812-13 (6th Cir.) (upholding administrative segregation over 900 days as not "atypical" under the Due Process Clause, given

confinement was not much different than experienced by other inmates in segregation); *Griffin*, 112 F.3d at 706-09 (3d Cir.) (concluding fifteen-month administrative segregation was within the "expected parameters of the sentence imposed on him" and that the Pennsylvania regulations on such confinement did not deprive him of a liberty interest or entitlement to procedural due process); *Beverati*, 120 F.3d at 504 (4th Cir.) (determining six-month placement in administrative segregation was not atypical compared with the general prison population even though officials kept inmates in their cells except for three to four times each week; denied them outside recreation, educational and religious services, warm or large portions of food, and clean clothing and bedding; and inmates' cells were infested with vermin, smeared with human feces and urine, flooded with water, and unbearably hot); *Pichardo v. Kinker*, 73 F.3d 612, 613 (5th Cir. 1996) (concluding inmate's contention that Texas prison policies on administrative segregation created a protectable liberty interest lacked an arguable basis in law or fact, and that "[i]n the wake of *Sandin*, ... administrative segregation, without more, simply does not constitute a deprivation of a constitutionally cognizable liberty interest").

While most circuits have generally rejected inmate contentions of liberty interest violations while in administrative detention, Mr. Hill relies on two circuit

-15-

court decisions which concluded otherwise based solely on the duration of the disciplinary detention at issue. In *Colon v. Howard*, the Second Circuit considered the duration of an inmate's 305-day disciplinary segregation in solitary confinement and simply stated, without analysis, it was "unaware of any data showing that New York frequently removes prisoners from the general population for as long as ... 305 days." 215 F.3d at 231. It held such a long segregation was a "sufficient departure from the ordinary incidents of prison life to require procedural due process protections." *Id.* In *Williams v. Fountain*, the Eleventh Circuit, in a footnote, merely "assumed" the inmate in question suffered a liberty interest deprivation entitling him to due process because his disciplinary sanctions included a full year of solitary confinement. 77 F.3d 372, 374 n.3 (11th Cir. 1996). Because these two cases involve disciplinary detentions only and merely help counter the liberty interest determinations made in our and other circuits, they do not irrefutably clarify the established law at the time of Mr. Hill's administrative detention.

The law on whether certain adverse conditions of confinement create a liberty interest continues to develop, as evidenced by the Supreme Court's recent decision in *Wilkinson v. Austin*. In *Wilkinson*, the Court determined the government created a liberty interest subject to procedural due process protections

-16-

when officials placed an inmate indefinitely in a super-max prison where almost all human contact was prohibited and which made him ineligible for parole. *See* ___ U.S. at ___, 125 S. Ct. at 2393-94. Obviously, the duration and conditions of Mr. Hill's administrative detention were not as onerous, nor was the duration of his sentence affected. More importantly, for the purpose of determining qualified immunity, the prison officials in Mr. Hill's case did not have the benefit of the 2005 *Wilkinson* decision or any of its implications on prisoners' liberty interests at the time of Mr. Hill's confinement. Thus, based on the wealth of cases considered, the established law at the time of Mr. Hill's confinement would not put prison officials on notice of a liberty interest created by the type of deprivation presented, including the 399-day duration or other conditions of his confinement.

## C. Application of 28 C.F.R. § 541.22

Because Mr. Hill also argues 28 C.F.R. § 541.22(c) provides a "state-created" liberty right, our analysis of the established law at the time of Mr. Hill's confinement does not end with a discussion of the duration, restrictions or other conditions of his detention, but continues with an examination of § 541.22(c) itself. As previously noted, prior to *Sandin*, a deprivation analysis of an inmate's liberty interest focused on the language of the state or federal prison regulations

and whether it was mandatory, as opposed to the subsequent *Sandin* requirement that the court look to the nature of the deprivation experienced by the inmate. *See Beverati*, 120 F.3d at 503 n.3. The Supreme Court in *Sandin* explained the problem in applying the regulation language method, stating "[b]y shifting the focus of the liberty interest inquiry to one based on the language of a particular regulation, and not the nature of the deprivation, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges." 515 U.S. at 481. Nevertheless, since its decision in *Sandi*n, the Supreme Court has acknowledged "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in *Sandin*" but explained "[a]fter *Sandin*, it is clear that the touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is not the language of regulations regarding those conditions but the nature of those conditions themselves." *Wilkinson*, ___ U.S. at ___, 125 S. Ct. at 2393-94. Therefore, we consider the established law with respect to § 541.22(c) as it existed at the time of Mr. Hill's confinement, keeping in mind the Supreme Court's strictures on considering the mandatory language of such regulations in a post-*Sandin* world.

To begin, this and other circuits have looked at whether 28 C.F.R.

§ 541.22(c) creates a liberty interest. Section 541.22 provides, in relevant part:

(c) Review of Inmates Housed in Administrative Detention.
(1) Except as otherwise provided in paragraphs (c)(2) and (c)(3) of this section, the Segregation Review Official will review the status of inmates housed in administrative detention. The SRO shall conduct a record review within three work days of the inmate's placement in administrative detention and shall hold a hearing and formally review the status of each inmate who spends seven continuous days in administrative detention, and thereafter shall review these cases on the record (in the inmate's absence) each week, and shall hold a hearing and review these cases formally at least every 30 days. The inmate appears before the SRO at the hearing unless the inmate waives the right to appear. A waiver may be in writing, signed by the inmate, or if the inmate refuses to sign a waiver, it shall be shown by a memorandum signed by staff and witnessed by a second staff member indicating the inmate's refusal to appear at the hearing. Staff shall conduct a psychiatric or psychological assessment including a personal interview, when administrative detention continues beyond 30 days. The assessment, submitted to the SRO in a written report, shall address the inmate's adjustment to surroundings and the threat the inmate poses to self, staff and other inmates. Staff shall conduct a similar psychiatric or psychological assessment and report at subsequent one-month intervals should detention continue for this extended period. Administrative detention is to be used only for short periods of time except where an inmate needs long-term protection (see § 541.23), or where there are exceptional circumstances, ordinarily tied to security or complex investigative concerns. An inmate may be kept in administrative detention for longer term protection only if the need for such protection is documented by the SRO. Provided institutional security is not compromised, the inmate shall receive at each formal review a written copy of the SRO's decision and the basis for this finding. The SRO shall release an inmate from administrative detention when reasons for placement cease to exist.

Prior to the Supreme Court's decision in *Sandin*, this court rendered an

unpublished decision in *Moore v. Ham,* in which we determined § 541.22 did not grant inmates a liberty interest in remaining in the general prison population and, alternatively, that the government did not deny the inmate in question due process under § 541.22, given the inmate received the required three-day review and was returned to the general prison population within three days. 986 F.2d 1428, 1993 WL 5874, at *1 (10th Cir. Jan. 12, 1993) (unpublished op.). Since entry of that decision and the Supreme Court's decision in *Sandin*, this court has not directly addressed the liberty and due process interests afforded by 28 C.F.R. § 541.22(c) in a published opinion. Instead, in an unpublished decision, we declined to consider an inmate's contentions § 541.22 created a liberty interest or afforded due process protections and held "a [prison official's] failure to adhere to administrative regulations does not equate to a constitutional violation." *See Malik v. Kindt*, 76 F.3d 393, 1996 WL 41828, at *2 (10th Cir. Feb. 2, 1996) (unpublished op.) (quoting *Hovater v. Robinson*, 1 F.3d 1063, 1068 n.4 (10th Cir. 1993)). In another unpublished case, this court generally determined "[n]either the Due Process Clause of the Constitution, nor the federal regulations governing placement of inmates in administrative detention, provide an inmate with a liberty interest in remaining in the general prison population." *Villarreal*, 1999 WL 1063830, at *2.

While this court has never definitively decided the liberty and due process implications of § 541.22 in a published opinion, a few circuits have. In *Crowder v. True*, the Seventh Circuit applied the principles in *Sandin* to conclude periodic review of administrative detention placement under § 541.22(c) bears none of the pivotal characteristics of an atypical and significant hardship on prisoners in relation to the ordinary incidents of prison life or a dramatic departure from the basic conditions or duration of the prisoner's sentence, and therefore, it did not create a constitutionally protected liberty interest. 74 F.3d 812, 815 (7th Cir. 1996). In so concluding, the court determined the regulation did not subject prisoners to more burdensome conditions but to "the normal limits or range of custody which the conviction has authorized the government to impose." *Id.* (quotation marks and citation omitted).

In contrast, nearly five years later, in *Tellier v. Fields*, the Second Circuit concluded, without discussion, that a prisoner's 514-day confinement in administrative detention under conditions markedly different than those in the general population was atypical and significant for the purpose of creating a liberty interest. 280 F.3d 69, 80 (2d Cir. 2000). It also held, with relatively much more analysis, the mandatory language in § 541.22 created a liberty interest requiring adherence to certain prerequisites and procedures. *Id.* at 80-83. In

considering § 541.22, it is clear the *Tellier* court focused on the mandatory language of the regulation rather than the nature of the deprivation. *Id.* at 80-81. We also note the court was considering a confinement which occurred between 1992 and 1994 and, therefore, was prior to the Supreme Court's 1995 *Sandin* decision which discouraged concentration solely on the mandatory language of such regulations. *Id.* at 73, 84. Similarly, in the Eleventh Circuit's decision in *Magluta v. Samples*, the court also applied pre-*Sandin* case law to the inmate's pre-*Sandin* confinement to determine § 541.22 contained the substantive predicates and mandatory language sufficient to create a liberty interest in remaining in the general prison population. 375 F.3d 1269, 1280-82 & n.8 (11th Cir. 2004). Obviously, because these cases considered § 541.22 under the pre-*Sandin* mandatory language analysis, with little concentration on the nature of the deprivation as required under *Sandin*, they are not persuasive in analyzing the established law during the post-*Sandin* period of Mr. Hill's 2001-2002 confinement.[10] As the Supreme Court suggests, the touchstone since *Sandin* must

---

[10] We also note the courts in both *Tellier* and *Magluta*, unlike here, denied the prison officials qualified immunity but are distinguishable from this case. In *Tellier*, the Second Circuit based its determination prison officials were not subject to qualified immunity based on the fact the detention occurred before *Sandin* when existing Second Circuit law on detentions was clearly established, so that even a ten-day confinement period was deemed to implicate procedural due process rights. 280 F.3d at 84. Similarly, the Eleventh Circuit's decision in *Magluta* denying qualified immunity to the prison officials involved was based on

(continued...)

-22-

be the nature of the deprivation rather than the mandatory language of the regulation. *Wilkinson*, ___ U.S. at ___, 125 S. Ct. at 2393-94. In any event, because the Eleventh Circuit did not issue its *Magluta* decision until 2004, prison officials did not have the benefit of that decision at the time of Mr. Hill's confinement.

Since *Sandin*, we have, on at least two occasions, generally evaluated state regulations to determine if they created a liberty or property interest. In *Cosco*, we considered whether a Wyoming state prison policy created a constitutionally-protected right of prisoners to keep property in their cells for the purpose of establishing procedural due process rights concerning retention of such property. 195 F.3d at 1223-24. In that case, we noted the Supreme Court in *Sandin* "expressly rejected the [*Hewitt*] methodology" of looking to the "mandatory language in statutes or regulations to determine whether the right in question rises to a level which can only be withdrawn by observing due process standards." *Id.* at 1223. In *Chambers v. Colorado Department of Corrections*, we did not

---

[10](...continued)
*pre-Sandin* precepts, given the detention at issue ended two months prior to the Supreme Court's issuance of the *Sandin* decision. 375 F.3d at 1283-84. Unlike those cases, Mr. Hill's detention occurred six years after the Supreme Court's *Sandin* case, so we examine existing post-*Sandin*, rather than pre-*Sandin*, law to make our determination of whether the constitutional right was "clearly established when the alleged violation occurred." *Olsen,* 312 F.3d at 1311-12.

consider the actual language of the prison policy classifying prisoners as sex offenders but instead determined the state's inconsistent application of that policy created a liberty interest because officials allowed an inmate so classified to receive earned time credits but later reduced his earned time credits based on his refusal to accept his classification. 205 F.3d 1237, 1239, 1242 (10th Cir. 2000). Neither of these two cases, nor the other cases considering § 541.22, would signal to the prison officials in Mr. Hill's case that § 541.22 created a liberty interest under post-*Sandin* precepts.

D.  Qualified Immunity Analysis

With the exception of the few circuit court decisions favoring Mr. Hill's position, and without delving further into the underlying rationale or distinguishing features of the decisions discussed, it is clear the weight of our and other circuits' decisions favors the prison officials' position they are entitled to qualified immunity.  As illustrated by the numerous Tenth Circuit cases cited, it would not be clear to prison officials whether an administrative detention of 399 days under the conditions cited by Mr. Hill, or the requirements in § 541.22(c), would implicate a liberty interest sufficient to warrant the procedural due process rights asserted by him.  As the district court noted, Tenth Circuit cases existing at the time of Mr. Hill's detention would not place officials on notice of a

deprivation, given none of those decisions found a liberty interest in the detention at issue, even when the duration was much longer than Mr. Hill's or involved similar restrictions. Even if prison officials considered other circuit court cases at the time of Mr. Hill's detention, the weight of those cases also concluded no liberty interest arose in an administrative detention where the conditions were worse or the duration longer than Mr. Hill's.

As to the differing assessments of § 541.22, it is not apparent the regulation created a liberty interest at the time of Mr. Hill's confinement, given this court's pre-*Sandin* decision concluded it created no liberty interest; the Seventh Circuit's post-*Sandin* decision held it created no liberty interest; the Second Circuit based its liberty interest determination almost exclusively on the pre-*Sandin* mandatory language analysis; and the Eleventh Circuit, which similarly applied pre-*Sandin* precepts, had not issued its 2004 decision in *Magluta* at the time of Mr. Hill's confinement. Under these circumstances, the established law concerning §541.22(c) at the time of Mr. Hill's detention would not place officials on notice it created a liberty interest affording procedural due process protections.

Thus, in assessing the burdens of the parties on the prison officials' claims of qualified immunity, we conclude Mr. Hill has not shown the constitutional or

statutory right which he asserts concerning the creation of a liberty interest triggering a procedural due process right was "clearly established when the alleged violation occurred." *Olsen,* 312 F.3d at 1312. In other words, he has not shown "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier*, 533 U.S. at 202.

## III. Conclusion

For the reasons articulated in the magistrate judge's recommendation, the district court's decision and those addressed here, we **AFFIRM** the district court's grant of summary judgment to the Appellees on the grounds of qualified immunity.

**Entered by the Court:**

**WADE BRORBY**
United States Circuit Judge