**F I L E D**
**Tenth Circuit**

PUBLISH

**January 24, 2007**

UNITED STATES COURT OF APPEALS

TENH CIRCUIT

---

ESTATE OF MIKI ANN DIMARCO,

Plaintiff-Appellee,[*]

v.

WYOMING DEPARTMENT OF
CORRECTIONS, DIVISION OF
PRISONS; WYOMING WOMEN'S
CENTER; JUDY UPHOFF; NOLA
BLACKBURN; VIKI McKINNEY;
KAREN REA; and DONNA LLOYD,

Defendants-Appellants.

Nos. 04-8024 and 04-8067

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF WYOMING
(D.C. NO. 03-CV-1006-CAB)

---

David L. Delicath, Senior Assistant Attorney General (Patrick J. Crank, Wyoming
Attorney General, John W. Renneisen, Deputy Attorney General, and Misha
Westby, Senior Assistant Attorney General, with him on the briefs), Office of the
Wyoming Attorney General, Cheyenne, Wyoming, for Appellants.

Kimberly A. Corey, Law Office of Tom Sedar, P.C., Casper Wyoming, for
Appellee.

---

[*] Plaintiff-Appellee Miki Ann DiMarco died in 2005. Her executor was
substituted as a party on appeal.

Before **TYMKOVICH** and **EBEL**, Circuit Judges, and **BROWNING**, District Judge.[**]

_____

**TYMKOVICH**, Circuit Judge.

_____

Miki Ann DiMarco lived her life as a woman even though she was anatomically male. In 2000, after she violated the terms of her probation, a Wyoming state court sentenced her to prison. Not realizing DiMarco's medical condition and believing her to be a woman, the court placed her in Wyoming's women's correctional facility in Laramie. It was only during a routine prison intake examination that prison officials learned DiMarco was a hermaphrodite[1]

Because the officials believed that she presented a safety risk, DiMarco was placed in administrative segregation apart from the rest of the prison population. After an initial evaluation period, officials decided to continue her administrative segregation because they concluded she should not be placed with the general

[**] James O. Browning, United States District Court, District of New Mexico, sitting by designation.

[1] According to the district court, DiMarco was a "hermaphrodite" or "intersexual." Dist. Ct. Mem. Order & J., Aplts. App. at 143. A hermaphrodite may have "both male and female characteristics, including in varying degrees reproductive organs, secondary sexual characteristics, and sexual behavior. This condition is the result of an abnormality of the sex chromosomes or a hormonal imbalance during the development of the embryo." _Id._ DiMarco had a penis but apparently had her testicles removed as part of gender reassignment surgery; she had no female reproductive organs.

-2-

female prison population. Her confinement was reviewed every ninety days, but she remained segregated until her release from prison 14 months later.

DiMarco does not contest her segregation on appeal. Rather, the issue is whether Wyoming had a constitutional duty to provide her an opportunity to challenge the placement and conditions of confinement under the Fourteenth Amendment's Due Process Clause. DiMarco contends that she had a right to contest her prior placement and living conditions through an administrative hearing, and that Wyoming violated her rights by failing to provide the hearing. The district court agreed and held that the Wyoming Department of Corrections and the individual defendants violated her procedural due process rights. Since she had been released from prison in 2002 and before the time of trial, the district court awarded $1,000 in nominal damages as well as costs, attorney's fees and expert fees.

Because we conclude DiMarco does not have a liberty interest in her placement and the conditions of confinement, we reverse.

## I. Background

*DiMarco's arrest*

In 1998, DiMarco pleaded guilty to check fraud in Wyoming and was placed on probation. She violated the terms of her probation by testing positive for drug use and failing to carry verifiable identification. Accordingly, a state

judge revoked her probation in early 2000 and sentenced her to two to four years imprisonment. She was temporarily committed to a county jail in Laramie, where she was housed with the general female population.

Wyoming then moved DiMarco to the state's only women's prison, the Wyoming Women's Center (WWC). There, she underwent a routine physical examination pursuant to intake processing policy. As a result of this exam, officials realized she was anatomically male, although she looked and presented herself as female. A prison doctor examined her and concluded that she suffered from gender identity disorder.

*DiMarco's confinement*

The WWC consists of two wings, the East and the West. The general prison population resides in the West wing. The East wing, where higher risk inmates are housed, consists of housing Pods 1, 2 and 3. New prisoners are routinely housed separately from the general prison population for about one month in Pod 2 while prison officials determine appropriate housing assignments. At intake, DiMarco was housed in Pod 3, the most restrictive and isolated housing pod used for inmates confined to administrative or protective custody.

Pod 3 consists of four cells, which are accessed through a small "day room." Each cell consists of a bed, a steel sink and a steel toilet. The cells are painted cement blocks with grey solid steel doors. The day room consists of a

small steel table with a steel bench, both bolted to the floor, and a television, which is mounted high on the wall and controlled by correctional officers. The other cells in Pod 3 were occupied intermittently during DiMarco's confinement.

Conditions in the West wing, by contrast, are more pleasant. The halls have brick facing, the floors are carpeted, and the cell doors are wooden. The West wing cells have cupboards for personal effects and space for hanging clothing. The day rooms in the West wing have furniture, tables, televisions, pictures and other accessories.

As part of their review of DiMarco's initial placement, prison officials determined that she was a low security risk. Placement officials nonetheless recommended that she be kept apart from the general population for three reasons: (1) DiMarco's safety and that of the general female inmate population, (2) her physical condition, and (3) the need to tailor programs for her condition. WWC's warden testified at trial that a primary concern was that other inmates might try to harm DiMarco if they discovered her physical condition. Furthermore, questions surrounded DiMarco's identity because of DiMarco's use of multiple, unverifiable aliases. The warden felt that she did not know enough about DiMarco to risk placing her in the general population.

After DiMarco's initial placement, prison officials reviewed her status every 90 days until her release. Each review yielded a decision to maintain

DiMarco's confinement in Pod 3, relying on the initial reasons for the placement. Following each assessment, DiMarco signed a document indicating she had reviewed the prison's placement decision and understood the reasons for her placement. The document explained, "Inmate DiMarco based on medical testing has been determined to be a male and therefore requires housing from other inmates." Aple. App. at 197.

*Prison conditions*

As detailed by the district court, DiMarco's general confinement met the basic necessities of life:

– DiMarco had adequate clothing, which was washed daily. Yet, she was only given two sets of clothing while the general population received five.

– DiMarco received three meals a day and ate the same food as the general population. Nevertheless, she had to eat in her cell and not with other inmates or in the Pod 3 day room. DiMarco was forced to sit on her bed or toilet to eat because her cell did not have a table or chair.

– DiMarco had access to the prison chaplain.

– DiMarco had access to reading materials from the library cart and could request books to be delivered to her.

– DiMarco had access to the gymnasium, but only when a guard could transport her and the facility was not being used by other prisoners.

– DiMarco received personal hygiene items at no cost to her, including soap, shampoo, toothpaste and a toothbrush.

DiMarco was denied other prison amenities. For instance, she was not allowed day-to-day contact with the other inmates. Nor did she have access to

some of the educational programs that would have put her in contact with other inmates. Even though DiMarco was not allowed routine contact with other inmates, she did have access to prison staff and medical personnel. Along with weekly contacts with her caseworker, DiMarco had frequent contact with the nursing staff, physician staff, and specialists located off-site. Shortly after beginning her sentence, DiMarco was included in two small treatment groups, which met for one hour counseling sessions each week. These sessions included other WWC inmates.

## II. Procedural History

Following her release from prison, DiMarco brought four federal claims: (1) a 42 U.S.C. § 1983 claim of excessive punishment under the Eighth Amendment; (2) a § 1983 procedural due process claim under the Fourteenth Amendment; (3) a § 1983 substantive due process claim under the Ninth and Fourteenth Amendments, and § 97-1-036 of the Wyoming Constitution; and (4) a § 1983 equal protection claim under the Fourteenth Amendment.

After a bench trial, the court denied DiMarco's excessive punishment and equal protection claims. The court determined DiMarco's segregated confinement did not amount to cruel and unusual punishment since the prison had legitimate concerns over institutional safety and because DiMarco was provided the basic necessities of food, shelter, clothing and medical treatment. In denying the claim,

the court also found that institutional safety concerns created by "[p]lacing an inmate of the opposite gender in a facility like the WWC . . . mandated separate housing." Aplts. App. at 167.

In rejecting DiMarco's equal protection claim, the court first determined that "individuals born with ambiguous gender" are not members of a quasi-suspect or constitutionally protected class, and that DiMarco was not denied a fundamental right. Applying rational basis review, the court found no equal protection violation "because Defendants' actions in placing Plaintiff in segregated confinement was rationally related to the legitimate purposes of ensuring the safety of Plaintiff and other inmates and security of the facility." *Id.* at 177–78.

The court, however, concluded that Wyoming's placement decision and subsequent reviews violated due process. It found that DiMarco's placement in solitary confinement for 438 days resulted in an atypical and significant departure from ordinary incidents of prison life, giving rise to a state-created liberty interest that required due process protection, and that DiMarco did not receive adequate due process.

Having found Defendants' conduct violated due process, the court also denied Defendants' claims of qualified immunity. The court awarded $1,000 in nominal damages, attorney's fees, and costs, which included expert fees.

Wyoming appealed the due process violation.[2]  DiMarco did not cross appeal the

Eighth Amendment and Equal Protection rulings.

### III.  Discussion

The question presented in this appeal is whether Wyoming violated

DiMarco's due process rights in its decision to place her in administrative

segregation without an adversarial hearing or right to appeal and its failure to

provide better living conditions during her confinement.  We hold that it did not.

Neither the Due Process Clause itself nor the policies or regulations of the State

of Wyoming allow DiMarco to challenge Wyoming's placement decision and

conditions of confinement.

### A.  Legal Framework

The Fourteenth Amendment provides that no state shall "deprive any person

of life, liberty, or property, without due process of law."  "A liberty interest may

arise from the Constitution itself, by reason of guarantees implicit in the word

'liberty,' or it may arise from an expectation or interest created by state laws or

policies."  *Wilkinson v. Austin*, 545 U.S. 209, 221 (2005) (citations omitted).  It is

well settled that due process protections extend to prisoners, though the extent of

---

[2] Neither party made a substantive due process claim on appeal.

that protection is significantly less than that guaranteed to free persons. *See, e.g.*, *Wolff v. McDonnell*, 418 U.S. 539, 555–57 (1974).[3]

For inmates in state prisons, however, "the Constitution itself does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement," although "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations." *Wilkinson*, 545 U.S. at 221. State policies or regulations will not create the basis for a liberty interest in the conditions of confinement so long as they do not "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

DiMarco argues that her conditions of confinement violate the rule established in *Sandin*. In particular, while conceding that segregation itself was appropriate, DiMarco contends that prison officials confined her in the most severe classification and did not give her the opportunity to obtain better amenities and more humane treatment. Moreover, although DiMarco received a review every 90 days, she argues that the prison gave her no meaningful right to appeal her living conditions throughout her confinement.

**1.**

---

[3] "The identification of the liberty interests that are protected by the Due Process Clause is a question of federal constitutional law that we review de novo." *Harper v. Young*, 64 F.3d 563, 566 (10th Cir. 1995).

The Supreme Court has held that a protected liberty interest may arise from prison placement decisions and conditions of confinement. Most recently, in *Wilkinson*, the Court examined Ohio's decision to place a prisoner in the state's "supermax" maximum security prison. In applying *Sandin*, the Court emphasized that the touchstone of the due process inquiry is not the precise language of a state's regulations regarding "restrictive conditions of confinement" but "the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" 545 U.S. at 223 (quoting *Sandin*). The Court concluded that the inquiry requires "identifying the baseline from which to measure what is atypical and significant in any particular prison system." *Id.*

Avoiding a discussion of the contours of a baseline analysis, the Court found that Ohio's supermax placement would impose an "atypical and significant hardship under any plausible baseline." *Id.* In particular, the Court found that the supermax placement implicated a prisoner's liberty interests for two reasons: (1) it was for an indefinite duration reviewed only annually; and (2) it disqualified an otherwise eligible inmate from parole consideration. According to the Court, "[w]hile any of these conditions standing alone might not be sufficient to create a liberty interest, *taken together* they impose an atypical and significant hardship within the correctional context." *Id* at 224 (emphasis added).

-11-

We have yet to apply *Wilkinson* to an inmate's placement in administrative segregation in a published opinion.[4]  Other courts, however, have examined *Wilkinson's* logic in reviewing prison placement decisions.  For example, in *Skinner v. Cunningham*, 430 F.3d 483 (1st Cir. 2005), the First Circuit understood *Wilkinson* to require courts to examine whether a prison's imposition of administrative "segregation was rational, that its duration was not excessive, and that the central condition—isolation from other prisoners—was essential to its purpose." *Id.* at 487.  Applying this analysis, the court found an inmate's six-week stay in isolation as a part of a murder investigation did not give rise to a liberty interest. *See also Harbin-Bey v. Rutter*, 420 F.3d 571 (6th Cir. 2005) (finding no right to remain in a particular prison or to a specific security classification).

We have explored this question recently in several unreported cases.  In *Jordan v. Fed. Bureau of Prisons*, 191 F.App'x. 639, 2006 U.S. App. LEXIS 14673, 2006 WL 2135513 (10th Cir. 2006), for example, we reviewed a prison's *five-year* placement of an inmate in administrative segregation as a result of a murder investigation.  We noted that our circuit, in analyzing whether segregation is atypical and significant, has used inconsistent standards in applying a comparative baseline.  On one hand, we have looked to conditions in the same

---

[4] Nor had *Wilkinson* been issued at the time of the district court's order.

*type* of segregation, whether it be administrative or protected custody. *Gaines v. Stenseng*, 292 F.3d 1222, 1224 (10th Cir. 2002). On the other hand, we have suggested an appropriate baseline is the condition of the *general* prison population. *Penrod v. Zavaras*, 94 F.3d 1399, 1407 (10th Cir. 1996).

While not answering the comparison baseline question, the *Jordan* court concluded that a 1,825-day stay in administrative detention did not create a liberty interest because (1) the detention was reasonably related to legitimate penological interests, namely, investigating the inmate's role in a murder; (2) the detention was reasonable in light of the legitimate security concerns of the institution; and (3) the conditions were not significantly different than generally confined inmates (noting fewer social calls and less recreation time as not significant). *Jordan*, *supra*. Similarly, in *Hill v. Fleming*, 173 F.App'x. 664 (10th Cir. April 4, 2006), we held that a 399-day stay in administrative detention did not violate an established liberty interest, even where the conditions were generally inferior to those for the general population.[5]

---

[5] Other unpublished cases have reached similar results. *See, e.g., Chappell v. McKune*, 1999 U.S. App. LEXIS 30754, 1999 WL 1079618 at *1 (10th Cir. Nov. 30, 1999) (1000 days in administrative segregation); *Villarreal v. Harrison*, 1999 U.S. App. LEXIS 30487, 1999 WL 1063830 at *2 & n.1 (10th Cir. Nov. 23, 1999) (2 year stay); *Blum v. Fed. Bureau of Prisons*, 1999 U.S. App. LEXIS 20051, 1999 WL 638232 at *3 (10th Cir. Aug 23, 1999) (90-day confinement); *Gutierrez v. Shanks*, 1998 U.S. App. LEXIS 15201, 1998 WL 380958 at *2 (10th Cir. July 9, 1998) (one year administrative segregation); *Klein v. Coblentz*, 1997

(continued...)

DiMarco also suggested at oral argument that the prison violated certain procedural rights contained in prison regulations which could give rise to a protected liberty interest. She argues that Wyoming Department of Corrections Policy No. 3.304 and 3.006[6] guaranteed certain amenities and required a hearing for prisoners incarcerated in restrictive housing. While it appears the prison did not strictly follow these policies in reviewing DiMarco's request for more amenities, it is clear the district court did not rely on them in finding a due process violation. In any event, it is "not the language of regulations regarding [prison] conditions *but the nature of those conditions themselves* 'in relation to the ordinary incidents of prison life'" that control due process claims. *Wilkinson*, 545 U.S. at 223 (emphasis added). The regulations themselves do not create an

_____

[5](...continued)
U.S. App. LEXIS 32757, 1997 WL 767538 at *3 (10th Cir. Nov. 19, 1997) (584 days); *Jones v. Fields*, 1996 U.S. App. LEXIS 33261, 1996 WL 731240 at 1-2 (10th Cir. Dec. 20, 1996) (15 months).

Other circuit court decisions have been consistent with these results. *See, e.g., Resnick v. Hayes*, 213 F.3d 443, 448 (9th Cir. 2000) (70 days in segregation without a hearing); *Hatch v. District of Columbia*, 184 F.3d 846, 857–58 (D.C. Cir. 1999) (seven months in segregation); *Sealey v. Giltner,* 197 F.3d 578, 589 (2d Cir. 1999) (101 days); *Jones v. Baker*, 155 F.3d 810, 813 (6th Cir. 1998) (two and one half years in segregation).

[6] Policy 3.304 lists the amenities available and procedures applicable to prisoners in protective custody while Policy 3.006 provides a right to a hearing and appeal for classified prisoners.

enforceable procedural right. *See also Cosco v. Uphoff*, 195 F.3d 1221 (10th Cir. 1999) (finding no liberty interest arising from Wyoming prison regulations).

**2.**

The question that must be answered in this appeal, then, is two-fold. First, what is the appropriate baseline comparison? Second, how significant must the conditions of confinement deviate from the baseline to create a liberty interest in additional procedural protections?

Here the baseline comparison question lends itself to several possible solutions. One option is to compare administrative segregation with conditions in the general population. A second option is to compare it with other, typical protective custodies. And a third option is, to compare it with that experienced by other uniquely placed or difficult to place prisoners—i.e., ill inmates, elderly inmates, or inmates with disabilities or under supervision because of mental illness or dependency.

In our view, the answer lies somewhere between these choices. It is simplistic to understand the *Sandin* formulation as suggesting a rigid either/or assessment. Rather, it makes sense to look at a few key factors, none dispositive, as the Supreme Court did in *Wilkinson*. But any assessment must be mindful of the primary management role of prison officials who should be free from second-guessing or micro-management from the federal courts. *See Sandin*, 515 U.S. at

482–84 (concluding *Sandin* test would reduce involvement of federal courts in management of prison conditions).

Relevant factors might include whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement, as it did in *Wilkinson*; and (4) the placement is indeterminate (in *Wilkinson* the placement was reviewed only annually).

In light of these considerations, we turn to see whether DiMarco's confinement in administrative segregation violated a liberty interest.

## B. Application to DiMarco

In applying the above factors to DiMarco, it is helpful to keep a few background facts in mind. DiMarco was an admittedly unique prisoner, with a physiological and psychological condition never before encountered by Wyoming prison officials. No one suggests the initial segregation for evaluative purposes was inappropriate or excessive. Prison officials consulted medical professionals in evaluating DiMarco's condition and relied, in part, on those opinions in their placement decision. DiMarco had access to prison staff and doctors throughout her confinement. Her placement was evaluated every ninety days, and she was given an opportunity to be heard at each evaluation. While her confinement was isolating, it provided the ordinary essentials of prison life. Finally, the prison had

to consider the needs of the general prison population, including rehabilitative goals and programs designed for them. Perhaps most importantly, DiMarco does not contend that segregation itself was unreasonable.[7]

In this context, we examine the factors set forth above.

*Purpose of Segregation*

Wyoming established several reasons for its placement of DiMarco in administrative segregation. First and foremost was safety. It determined that DiMarco might be a risk if introduced to the general population of the prison. Many of the women confined in the prison were victims of sexual assault. Some might be fearful of DiMarco, even though she functioned as a woman; others might threaten DiMarco for different reasons. While DiMarco was not deemed a particularly high risk, we cannot discount the prison's concerns about placing her in what it perceived as a potential security problem. As the district court found, prison officials had (1) a "legitimate reason to believe there was a potential, substantial risk of serious harm to either WWC inmates or Plaintiff," and (2) the "housing assignment and separation of Plaintiff from the general population was for a legitimate security reason." Aplts. App. at 166.

---

[7] At oral argument, counsel agreed that DiMarco was not insisting that she be placed in the general population.

-17-

Second, Wyoming concluded that it did not have adequate facilities for inmates such as DiMarco. Wyoming is a small state with a relatively small prison population. Large states with larger urban populations have begun to establish facilities for transsexual inmates, but most states have yet to develop specific facilities or programs directed to this population. While states now have the option of transferring prisoners to out-of-state facilities, the record in this case does not suggest that option was available to Wyoming, especially considering DiMarco's term of confinement and the cost of transfer. Prudence dictates that sending her to Wyoming's men's prison was not a plausible alternative.

*Conditions of Confinement*

DiMarco's conditions of confinement were admittedly spartan, but not atypical of protective custody. She had access to the basic essentials of life, although her access to certain amenities was more limited than the general population. She had adequate clean clothing; ate the same meals as the general population; had access to library, recreational, and religious facilities; participated in out-of-cell time of at least five-and-one-half hours a day; and was given personal hygiene items. She was denied interaction with other inmates, and certain amenities such as nail clippers and mirrors in her cell that were not allowed in her pod. The prison has no constitutional duty to equalize these type of amenities in every detail. Nor does a prisoner have a right to access every type

-18-

of program available to other inmates, ranging from work to recreation. The district court found as much in rejecting DiMarco's equal protection and cruel and unusual punishment claims.

DiMarco was also provided access to a number of prison programs. She was part of small group counseling sessions with other inmates, she had weekly individual psychiatric sessions, and monthly visits from a psychiatric specialist. Her caseworker met regularly to discuss her concerns about her conditions and placement.

Having said this, given her unique condition it is hard to believe the prison could not make better accommodations for her long-term placement. Many of her complaints about living conditions were commonplace and the petty denial of certain amenities borders on the absurd. For example, the prison did not allow her to own playing cards or eat meals outside her cell. While DiMarco's circumstances were a challenge to the prison, Wyoming could have been more flexible in responding to her needs.

*Duration of Confinement*

Wyoming's placement decision did not extend DiMarco's confinement. In fact, she was released after serving 14 months of a two- to four- year sentence. Given the fact that DiMarco only attacks the conditions of her segregation and not her placement in segregated housing, this factor does not weigh in her favor.

-19-

*Indefiniteness of Confinement*

DiMarco's placement was reviewed every ninety days. And unlike the inmate in *Wilkinson*, whose placement in supermax was subject only to an annual review and disqualified the inmate from parole consideration, DiMarco had regular reevaluations throughout her confinement. The prison used a management team process to evaluate her behavior and mental health progress, and to provide goals to attain prior to her next review. This team recommended continued separated housing in Pod 3. Importantly, she was interviewed as a part of the review, and allowed to present her views. While the management team concluded administrative segregation was the proper assignment, DiMarco was not isolated from prison staff nor was she denied the opportunity to object to the conditions of her confinement. As noted above, DiMarco has conceded that segregation was a reasonable placement decision.

Taken together, these factors do not weigh in favor of finding that DiMarco has an enforceable liberty interest. While we are sympathetic with her complaints about the petty deprivations resulting from her confinement, and are confident prison officials could have done better, we cannot conclude that the prison imposed such an atypical and significant hardship on her as to meet the *Sandin* standard.

**C. Procedural Protections**

Even if we did find a protected liberty interest, DiMarco's claim would still not succeed. Wyoming provided adequate procedural protections to justify its placement decisions.

The question of "what process is due" was recently examined by the Supreme Court in *Wilkinson v. Austin*, *supra*. Applying the traditional framework governing procedural due process, *Mathews v. Eldridge*, 424 U.S. 319 (1976),[8] the Court found that a relaxed set of procedures satisfied an inmate's challenge to a placement decision or conditions of confinement. Due process was satisfied as long as a state allowed (1) a sufficient initial level of process, i.e., a reasoned examination of the assignment; (2) the opportunity for the inmate to receive notice and respond to the decision; and (3) safety and security concerns to be weighed as part of the placement decision. *Wilkinson,* 545 U.S. at 226–27. Moreover, the Court emphasized that where a decision "draws more on the experience of prison administrators, and where the State's interest implicates the

---

[8] *Mathews* requires consideration of three distinct factors:

First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

424 U.S. at 335.

safety of other inmates and prison personnel, [] informal, nonadversary procedures" that allow notice and the opportunity to be heard are sufficient. *Id.* at 228–29 (relying on *Greenholtz v. Inmates of Neb. Penal and Correctional Complex*, 442 U.S. 1 (1979)).

Wyoming has met these factors. First, its initial placement decision was appropriate given DiMarco's unique background. Her confinement was the same as other female prisoners assigned to WWC, and prisoners are not entitled to notice and hearing upon intake.[9] She was aware of and agreed to her subsequent assignment to administrative segregation. After that, the prison provided periodic and meaningful reviews of her status, including meetings that DiMarco could attend. DiMarco's objections were noted in subsequent reviews. She signed the classification form generated by the prison indicating that she had reviewed the form and the reasons for the custody level had been explained to her.[10] While she was not allowed to present witness testimony, nor were there other trappings of the adversarial process, these are not required to satisfy due process. Her placement decision was reviewed by several decision makers, including the warden. Each concluded her placement and conditions were appropriate.

---

[9] Notice is less weighty in this case since DiMarco agrees that segregated housing was appropriate.

[10] The management team review form reports that "Inmate DiMarco states she understands the reason for the override." Aplts. App. at 240.

Moreover, prison officials consulted and relied on psychiatric professionals in making the placement and treatment decisions.

In sum, the totality of the process DiMarco enjoyed satisfies due process.

## IV. Conclusion

Because we conclude that DiMarco did not have a protected liberty interest that Wyoming violated, we need not reach the question of whether prison officials were entitled to qualified immunity.

Accordingly, we REVERSE the decision of the district court. We also REVERSE the district court's award of costs and attorneys fees in No. 04-8067 since DiMarco was not a prevailing party under 42 U.S.C. § 1988. Appellants' motion to file a supplemental appendix is granted.