**PUBLISH**
**FOR THE TENTH CIRCUIT**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**August 29, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

RICHARD GRISSOM,

Plaintiff - Appellant

v.

RAYMOND ROBERTS, Secretary of
Corrections, in his individual and official
capacity; JOHNNIE GODDARD, Deputy
Secretary for Facilities Management, in his
individual and official capacity; JAMES
HEIMGARTNER, Warden, El Dorado
Correctional Facility, in his individual and
official capacity; GARY WILSON,
Classification Administrator, El Dorado
Correctional Facility, in his individual and
official capacity; SUSAN GIBREAL,
Deputy Warden, El Dorado Correctional
Facility, in her individual and official
capacity; PAUL SNYDER, Deputy
Warden, El Dorado Correctional Facility,
in his individual and official capacity;
FRED EARLY, Deputy Warden, El
Dorado Correctional Facility, in his
individual and official capacity; DALE
CALL, Compliance Officer, El Dorado
Correctional Facility, in his individual and
official capacity; MARY WILSON,
Deputy Warden, El Dorado Correctional
Facility, in her individual and official
capacity; DEANE DONLEY,
Classification Administrator, El Dorado
Correctional Facility, in his individual and
official capacity; MARIA BOS,
Compliance Officer, El Dorado
Correctional Facility, in her individual and

No. 17-3185

official capacity; TIMOTHY RANDA, Segregation Lieutenant, El Dorado Correctional Facility, in his individual and official capacity; CONNIE ZABEL, Clinical Staff, El Dorado Correctional Facility, in her individual and official capacity; ROLAND BUCHANAN, Segregation Lieutenant, El Dorado Correctional Facility, in his individual and official capacity; MATTHEW MOORE, Correctional Counselor II, El Dorado Correctional Facility, in his individual and official capacity; KATHERINE CLOUSER, Clinical Staff, El Dorado Correctional Facility, in her individual and official capacity; BRANDON WALMSLEY, Unit Team Manager, El Dorado Correctional Facility, in his individual and official capacity; BILLIE GREY, Corrections Counselor I, El Dorado Correctional Facility, in her individual and official capacity; ALLISON AUSTIN, Corrections Counselor II, El Dorado Correctional Facility, in her individual and official capacity; CHARLES MILLER, Corrections Counselor II, El Dorado Correctional Facility, in his individual and official capacity; TAMMY MARTIN, Unit Team Manager, El Dorado Correctional Facility, in her individual and official capacity,

       Defendants - Appellees.

------------------------------

STUART GRASSIAN, M.D.; TERRY A. KUPERS, M.D., M.S.P.; PABLO STEWART, M.D.,

       Amici Curiae.

_____

2

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 5:15-CV-03221-JTM-DJW)**

_____

Susan M. Razzano, Eimer Stahl LLP, Chicago, Illinois (Brian Y. Chang, Eimer Stahl, LLP, Chicago, Illinois, Daniel M. Greenfield, Northwestern Pritzker School of Law, Bluhm Legal Clinic, Roderick and Solange MacArthur Justice Center, Chicago, Illinois, with her on the briefs), for Plaintiff-Appellant.

Dwight R. Carswell, Assistant Solicitor General, Topeka, Kansas (Toby Crouse, Solicitor General of Kansas, Bryan C. Clark, Assistant Solicitor General, Rachael D. Longhofer, Assistant Attorney General, Roger W. Slead, and Jeffrey T. Donoho, Horn, Aylward & Bandy, LLC, Kansas City, Missouri, with him on the brief), for Defendants-Appellees.

Brook R. Long, Winston & Strawn, LLP, Chicago, Illinois, and Claire A. Fundakowski, Winston & Strawn, LLP, Washington, D.C. filed an Amici Curiae brief in support of Plaintiff-Appellant.

_____

Before **LUCERO**, **BALDOCK**, and **HARTZ**, Circuit Judges.

_____

**HARTZ**, Circuit Judge.

_____

Richard Grissom, a prisoner in the custody of the Kansas Department of Corrections, brought suit under 42 U.S.C. § 1983 against a number of state corrections and prison officials (collectively the Prison Officials), alleging violations of his constitutional rights stemming from his lengthy placement in solitary confinement. The district court granted summary judgment against Grissom, and he appeals. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm. The Prison Officials are entitled to qualified immunity because at the time of Grissom's confinement there was no clearly established law that would have alerted them that his asserted constitutional rights were being violated.

## I.   BACKGROUND

After being convicted in 1989 of a number of crimes, including the murders of three women and aggravated kidnapping, Grissom began serving four consecutive life sentences. He spent six years in general population until he was placed in solitary confinement in 1996 based on allegations that he was trafficking drugs. (Grissom uses the term *solitary confinement*. The Prison Officials speak of *administrative segregation*, a less emotive term. For convenience, we will generally use Grissom's nomenclature.) Grissom remained in solitary at several Kansas prisons—Lansing Correctional Facility (LCF), El Dorado Correctional Facility (EDCF), and Hutchinson Correctional Facility (HCF)—for nearly 20 years before being returned to general population in 2016.

This is Grissom's second lawsuit challenging his solitary confinement. In his first lawsuit the district court granted summary judgment against him, holding that there had been no constitutional violation. *See Grissom v. Werholtz*, No. 07-3302-SAC, 2012 WL 3732895 (D. Kan. August 28, 2012) (*Grissom I*). We affirmed. *See Grissom v. Werholtz*, 524 F. App'x. 467 (10th Cir. 2013) (*Grissom II*).

 In September 2015 Grissom filed his pro se complaint in this case, asserting that his two decades in solitary violated his Fourteenth Amendment rights to due process and equal protection. He later filed an amended complaint expanding on his allegations and adding an Eighth Amendment claim, and then he filed a supplemental complaint adding new defendants who allegedly retaliated against him. The district court considered both his amended and supplemental complaints and again granted summary judgment against him. *See Grissom v. Roberts*, No. 15-3221-JTM, 2017 WL 3130591, at *7 (D. Kan. July

4

24, 2017) (*Grissom III*).  For our purposes the amended complaint is the relevant pleading, as Grissom does not raise on appeal any of the additional claims from his supplemental complaint.

## II.  STANDARD OF REVIEW AND QUALIFIED IMMUNITY

"We review summary judgments de novo, applying the same standards that the district court should apply."  *United States v. Turley*, 878 F.3d 953, 956 (10th Cir. 2017). "When reviewing a grant of summary judgment, this court must examine the record to determine whether any genuine issue of material fact pertinent to the ruling remains and, if not, whether the substantive law was correctly applied."  *Id.* (internal quotation marks omitted).

Individual defendants sued for damages under § 1983 may raise a defense of qualified immunity.  "Qualified immunity attaches when an official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (internal quotation marks omitted).  This standard arises from balancing two important but contrary interests. On the one hand, "an action for damages may offer the only realistic avenue for vindication of constitutional guarantees."  *Harlow v. Fitzgerald*, 457 U.S. 800, 814 (1982).  On the other hand, exposing public officials to liability for damages presents its own "social costs[,] includ[ing] the expenses of litigation, the diversion of official energy from pressing public issues, and the deterrence of able citizens from acceptance of public office."  *Id.*  And, perhaps most significantly, "there is the danger that fear of being sued will dampen the ardor of all but the most resolute, or the most irresponsible public

officials, in the unflinching discharge of their duties." *Id.* (brackets and internal quotation marks omitted).

"Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted). Thus, when a defendant has raised qualified immunity as a defense, the plaintiff must establish (1) that the defendant's action violated a federal constitutional or statutory right; and (2) that the right violated was clearly established at the time of the defendant's actions. *See Thomson v. Salt Lake Cty.*, 584 F.3d 1304, 1312 (10th Cir. 2009). Under this test, "immunity protects all but the plainly incompetent or those who knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted).

The test imposes a "heavy two-part burden." *Casey v. W. Las Vegas Indep. Sch. Dist.*, 473 F.3d 1323, 1327 (10th Cir. 2007) (internal quotation marks omitted). If the plaintiff fails to satisfy either part of the two-part inquiry, a court must grant the defendant qualified immunity. *See Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). The court has discretion to decide which of the two prongs of the qualified-immunity analysis to address first. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment . . . ." *Clark v. Edmunds*, 513 F.3d 1219, 1222 (10th Cir. 2008) (internal quotation marks omitted).

This court has stated that "[o]rdinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the

6

clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." *Toevs v. Reid*, 685 F.3d 903, 916 (10th Cir. 2012) (internal quotation marks omitted). When we say "on point," we do not mean that the precedent has merely stated a general proposition of applicable law. The Supreme Court has repeatedly advised the lower courts "not to define clearly established law at a high level of generality." *Kisela*, 138 S. Ct. at 1152. Although Supreme Court precedent "does not require a case directly on point for a right to be clearly established, existing precedent must have placed the statutory or constitutional question *beyond debate*." *Id.* (emphasis added) (internal quotation marks omitted).

The role of an unpublished nonprecedential opinion in this enterprise depends on whether the opinion is being used to show that the plaintiff's proffered proposition is clearly established law or to show that the proposition is unsettled. We have held that "[a]n unpublished opinion . . . provides little support for the notion that the law is clearly established on [a] point." *Mecham v. Frazier*, 500 F.3d 1200, 1206 (10th Cir. 2007). But an unpublished opinion can be quite relevant in showing that the law was *not* clearly established. If we make the collegial, and quite legitimate, assumption that panels of this court render reasonable decisions, we would be hard pressed to say that a proposition of law was clearly established at a time when an unpublished opinion by a panel of this court said the opposite. To do so we would have to say that the panel's decision was contrary to clearly established law at the time it was rendered. Our assumption does not require us to credit the unpublished opinion as being correct, only as being debatably correct.

7

And there is perhaps a more important reason to presume that an unpublished decision was not contrary to clearly established law at the time. The purpose of the qualified-immunity test is to limit liability to those public officials who are "plainly incompetent or . . . knowingly violate the law." *Kisela*, 138 S. Ct. at 1152 (internal quotation marks omitted). This purpose would be ill served if liability were imposed on an official for conduct that had been held to be lawful, even in an unpublished opinion, by the federal appellate court with jurisdiction over the conduct, at least in the absence of later contrary authority issued before the official acted. Could we properly say that an official was plainly incompetent for taking guidance from an unpublished appellate opinion? *See Apodaca v. Raemisch*, 864 F.3d 1071, 1078 (10th Cir. 2017) (relying in part on an unpublished opinion to hold that law was not clearly established); *Fields v. City of Phila.*, 862 F.3d 353, 361 (3d Cir. 2017) (prior unpublished decision indicates that law was not clearly established at the time it was issued). The argument favoring consideration of an unpublished opinion is particularly compelling if the same alleged victim and same defendant conduct are involved. *See Prison Legal News v. Cook*, 238 F.3d 1145, 1152 & n.8 (9th Cir. 2001) (determination that law was not clearly established in plaintiff's favor is supported by two unpublished district-court opinions that had upheld the same regulation of the state department of corrections, which had notice of the two opinions); *Brown v. Wilson Cty.*, No. 00-50893, 2001 WL 650397 at *2 (5th Cir. May 28, 2001) (unpublished) (per curiam) ("Although the opinion in the prior appeal [in the same case] is nonprecedential, its analysis of the issue whether the seizure of the

8

Browns' animals presents a violation of a clearly established constitutional right applies with equal force to the instant case.").

We now address Grissom's three constitutional claims.

### III.   FOURTEENTH AMENDMENT DUE PROCESS

The Fourteenth Amendment to the United States Constitution provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law . . . ."  To establish a due-process violation, a prison inmate challenging the conditions of his confinement must show that the defendants deprived him of a constitutionally protected liberty interest.  *See Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).  Conditions of confinement do not implicate a liberty interest unless they "impose[] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  *Sandin v. Conner*, 515 U.S. 472, 484 (1995).

On appeal the parties agree that to determine whether Grissom's solitary confinement violated a liberty interest under the Fourteenth Amendment, we should apply the four-factor test of *Estate of DiMarco v. Wyoming Department of Corrections*, 473 F.3d 1334, 1342 (10th Cir. 2007), for determining whether segregated confinement imposes an atypical and significant hardship:  "whether (1) the segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) the conditions of placement are extreme; (3) the placement increases the duration of confinement . . . ; and (4) the placement is indeterminate."

Grissom contends that three of the four factors support his claim.  He correctly concedes that he certainly loses on the third factor; he is not eligible for parole until 2093,

9

so his segregation will not affect the overall length of his confinement. As to the first factor, he claims that "the prison's stated penological interests for keeping him in segregation were stale and also excessive in relation to their purpose." Aplt. Br. at 20. He points to documents in which the Prison Officials repeatedly justified his solitary confinement on the basis of "placement fact[s]," but the only such fact described in the documents was his 1996 drug activity. *Id.* And he asserts that he had fewer disciplinary incidents than other inmates who were returned to general population much sooner.

Regarding the second *DiMarco* factor, Grissom complains that he was subjected to heightened restrictions and fewer privileges than comparable prisoners and that his confinement was "injurious." *Id.* at 23. Some of the adverse conditions he described are the following: The solitary cells are "eight-by-fourteen feet[,] contain a solid concrete bed with a two-inch mattress[, and] are designed to maximize sensory deprivation—they have solid metal doors trimmed with rubber seals such that, when the cell door is closed, no sound can enter or exit the cell." Aplt. Br. at 6. He was able to use library materials only if he made a written request; his cell was always more or less lighted, even at night; he spent 23 to 24 hours a day in his cell and ate all his meals alone; and visitation was restricted to one hour by video on Saturdays and Sundays.[1] Grissom asserts that he has "suffered significant psychological and physiological injury" because of these conditions:

---

[1] The description in Grissom's brief does not paint a complete picture of the conditions of his confinement. He was not totally isolated from fellow inmates. Inmates stated in affidavits submitted by Grissom that inmates in segregation communicated by speaking through vents and even played chess that way. In an improper note to a guard, Grissom wrote, "I'm extremely prudent and that's why I talk so quietly sometimes to avoid nosy neighbors." App., Vol. 2 at 374. And Grissom's administrative-segregation-review

He has become emotionally detached, non-emotive, and bitter. He suffers from insomnia, exhaustion, paranoia, and depression. The one meaningful relationship Grissom did have while in prison—his marriage—eventually collapsed because of his psychological changes. Human contact now causes Grissom discomfort.

*Id.* at 8–9 (citations to record omitted).[2]

With respect to the fourth *DiMarco* factor, Grissom argues that his confinement was indefinite because there was no fixed timetable for his release to the general population.

After presenting his argument that he had a liberty interest in being released from solitary confinement, Grissom next argues that he was deprived of that liberty interest without procedural due process because the reviews conducted by the Prison Officials were perfunctory and a sham. He placed in the record the forms for 25 consecutive monthly segregation reviews (for December 2013 through December 2015), all of which gave just one reason justifying Grissom's continued segregation: "Placement facts still

---

forms in 2013 and early 2014 stated that he "continue[d] to mentor inmate Nguyen in speaking and writing English" and "continue[d] to help inmate Nguyen with homework assignments." App., Vol. 1 at 75–84.

Also, inmates in administrative segregation in EDCF—where Grissom was housed when he filed his complaint in this case—are permitted outdoor recreation with other inmates up to four times per week, weather permitting. They are permitted to use electronic audio-visual devices with the use of headphones, they have telephone privileges from 5 a.m. to 10 p.m. daily, and they are permitted two one-hour no-contact visits every week, using video equipment in booths within the prison. Grissom lived for most of the time between his appeals to this court in EDCF cellhouse C. His complaint states that cellhouse C is less restrictive than the other cellhouses at EDCF used for administrative segregation.

[2] The record shows, however, that Grissom never requested mental-health services. He responded to frequent walk-throughs by mental-health professionals by saying that he was fine and did not need anything.

apply." Aplt. App., Vol. 1 at 85. Only one placement fact is described on those forms—the 1996 drug-trafficking violation—although all state that he is considered "an extreme escape risk." *Id.* Grissom also filed an affidavit stating that he observed that prisoners who attended their segregation reviews usually spent less than a minute with the reviewers. We need not address this issue, however, because the Prison Officials are entitled to qualified immunity with regard to the existence of a liberty interest.

Where Grissom fails is in not providing clearly established law to support his claim. There is a great hurdle in his path, and he has not persuaded us that he surmounted it. That hurdle is this court's decision in his earlier challenge to his solitary confinement. In *Grissom II*, 524 F. App'x. 467, we affirmed the district court's summary judgment (based on its analysis of the *DiMarco* factors) rejecting his claim that his solitary confinement from June 2005 to the time of our decision had violated his right to due process. In particular, we held that his solitary confinement did not infringe a protected liberty interest. *See id.* at 474–75.

True, our prior opinion was not published precedent of this circuit. But, as explained above, even an unpublished opinion can demonstrate that the law was *not* clearly established at the time the opinion was issued, at least within the circuit of the court issuing the opinion, and particularly when considering qualified immunity for the same conduct impacting the same plaintiff. The question before us therefore boils down to whether something significant has happened since our opinion was filed.

One matter of significance would be Supreme Court or Tenth Circuit precedent postdating our prior decision that has now clearly established law that had not been previously so established. But Grissom points to no such recent authority.

Similar significance could attach to a substantial change in the facts concerning Grissom's solitary confinement between his prior appeal and this case. We therefore examine whether any of the facts relevant to the *DiMarco* factors are different.

The first *DiMarco* factor is the relationship between the nature of Grissom's confinement and the penological interests asserted by the prison. In his prior appeal we noted the following:

> Mr. Grissom has been in administrative segregation since August 4, 1996. He was initially placed in segregation while incarcerated at LCF, pending an investigation into his alleged involvement in narcotics trafficking at the prison. In October of that year, his status was changed to "Other Security Risk" after the investigation found that he was responsible for the procurement and trafficking of contraband drugs at LCF. In December 1996, Mr. Grissom was transferred from administrative segregation at LCF to administrative segregation at EDCF. When Mr. Grissom asked for an explanation for his continued retention in segregation, he was informed of the results of the investigation and told that "[d]ue to the elaborate method used to traffic [the] contraband drugs, you are considered a threat to the security of this facility if released to general population."
>
> On February 15, 2001, Mr. Grissom's status was changed to "Extreme Escape Risk" after prison officials intercepted a letter from an outside source in which the sender indicated a desire to aid Mr. Grissom in escaping LCF once he was released back into general population. His status was changed back to "Other Security Risk" on June 6, 2003. He remained in administrative segregation.
>
> On November 25, 2003, while Mr. Grissom was in administrative segregation at EDCF, prison officers found several contraband items, including a cellular phone with extra batteries and accessories, in his cell. He was charged with trafficking in contraband in a correctional institution,

13

a felony. He pled no contest and was placed in disciplinary segregation for thirty days.

On January 26, 2005, while in administrative segregation at EDCF, a cellular telephone was found on the floor near Mr. Grissom during a strip search. He was charged with a violation of Kansas administrative regulations prohibiting the possession of dangerous contraband by inmates. He pled no contest and was placed in disciplinary segregation for thirty days. In February, he was transferred to administrative segregation at LCF.

On June 1, 2005, while Mr. Grissom was in administrative segregation at LCF, prison officers discovered numerous items of contraband in his cell, including: two cellular telephones, chargers for the phones, sandpaper, razors, a soldering iron, box cutter blades, a screw driver and drill bits. Mr. Grissom pled not guilty to the charge of possessing dangerous contraband. He participated in a disciplinary hearing and was found guilty. He was given forty-five days in disciplinary segregation. A week later he was transferred to administrative segregation at HCF.

Because of the seriousness of Mr. Grissom's three contraband violations while he was in administrative segregation, Defendant Louis E. Bruce, the warden at HCF during that time, felt compelled to develop a more restrictive protocol to manage Mr. Grissom. Mr. Bruce stated in his affidavit that:

> Cell phones are one of the most concerning devices an inmate can possess. Not only do cell phones permit the inmate to communicate beyond the ability of the correctional facility to monitor him, but an inmate with a cell phone can actually execute an escape plan with those on the outside, which was another serious concern about [Mr. Grissom] possibly attempting an escape.

*Grissom II*, 524 F. App'x. at 469–70 (record citations omitted).

With respect to this factor, Grissom claims that "the prison's stated penological interests for keeping him in segregation were stale and also excessive in relation to their purpose." Aplt. Br. at 20. But we held that those interests sufficed in 2013 (eight years after the last reported incident). And Grissom has pointed to no authority clearly

14

establishing that the underlying facts could not continue to suffice for another three years, until his release from solitary in 2016. Moreover, Grissom engaged in significant misconduct during that three-year period. In October 2015 he propositioned a female correction officer in a sexually explicit note passed to her. The note gave her instructions on how to communicate with him using a nontraceable cell phone maintained for him by an acquaintance on the outside. The warden submitted to the district court an affidavit saying that Grissom's history "show[ed] a pattern of influencing and compromising staff and other offenders who will supply him with contraband, including cell phones. This type of behavior is one of the primary reasons that he remained in administrative segregation." Aplt. App. Vol. 2 at 315. Specifically with respect to the note to the female officer, the affidavit stated: "I was very disappointed to learn that he continued to try to manipulate staff by attempting to compromise the staff member. Had the staff member responded to his suggestions and put her response in writing, he would have a compromising letter that could have been used as leverage against the staff member." *Id.*

As to the second *DiMarco* factor, Grissom argues that conditions of solitary confinement generally are harsh and atypical, but he does not argue that the conditions of his confinement have become more severe since *Grissom II*. *See Grissom III*, 2017 WL 3130591, at *7 ("the segregation experienced by Grissom is similar to that addressed in *Grissom I*").

And regarding the fourth *DiMarco* factor, Grissom does not rely on any material change in the facts since our prior decision. The reasons he gives for viewing his solitary

15

confinement as indefinite apply equally to the circumstances at the time of his prior appeal.

Given Grissom's failure to point to any controlling Supreme Court or Tenth Circuit precedent that would change the established law since his prior appeal, and his failure to point to any factual changes since that appeal that would be decisive under clearly established law, we are compelled to hold that the Prison Officials are entitled to qualified immunity on his due-process claim.[3]

## IV.    FOURTEENTH AMENDMENT EQUAL PROTECTION

Grissom, who is an African-American, also complains that his placement in solitary confinement violated his right to equal protection under the Fourteenth Amendment because he was treated worse than white prisoners.  *See* U.S. Const. amend. XIV, § 1 ("No State shall . . .  deny to any person within its jurisdiction the equal protection of the laws.").  The Equal Protection Clause directs "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  Thus, to establish an equal-protection violation, Grissom must show that the

---

[3]  Our affirmance of the judgment in favor of the Prison Officials does not constitute an endorsement of the conduct of reviews of prisoner segregation status, as described by Grissom.  If the description is accurate, the practices are troubling.  True, it would be hard to say that the practices violate clearly established law, because the Supreme Court has expressed great deference to the judgment of prison officials and has set only minimal due-process standards. *See Wilkinson v. Austin*, 545 U.S. 209, 228–29 (2005). *But see Toevs*, 685 F.3d at 907, 913 (explanations of decisions in periodic reviews of prisoner segregation were inadequate when "the exclusive justification for keeping [the prisoner] in administrative segregation was to influence him to modify his future behavior").  But professional prison administrators should be able to explain their decision-making with more clarity than just repeating three words.

Prison Officials treated him differently from similarly situated white prisoners. "Individuals are similarly situated only if they are alike in all relevant respects." *Requena v. Roberts*, 893 F.3d 1195, 1210 (10th Cir. 2018) (internal quotation marks omitted).

Determining whether two prisoners are similarly situated is a fact-intensive exercise. To decide whether they should be subject to the same conditions of confinement, it would be important to know the history of their conduct in prison, including the specifics of any infractions they have committed; the criminal offenses that placed them in prison; and even the time remaining on their terms of imprisonment. It is not the responsibility of this court to scour the record to see what information is available on these matters. To obtain relief, appellant's counsel should present the relevant facts in the opening brief and explain why the selected prisoners should have been treated the same. The opening brief in this case utterly fails in that regard. The sole comment on the factual background presented in the argument section of Grissom's opening brief simply states that the district court "ignore[d] the various facts proffered by Grissom that support his racial-discrimination claim." Aplt. Br. at 51. A citation after the sentence directs the reader to the brief's Statement of the Facts, which includes one paragraph that itself falls far short of providing the necessary specifics. *See, e.g.*, Aplt. Br. at 9 ("Black prisoners spend twice as long in segregation as White prisoners. Grissom also proffers multiple examples of White prisoners with more, and more serious, [disciplinary reports] (including assaults and batteries on officers) who had significantly shorter confinements in segregation then Grissom." (record citations omitted)). And even if we turn to the

17

portions of the record cited by Grissom without further explanation, we need substantially more information to make a proper comparison. It is a party's duty to develop an argument if it wishes a determination by this court. *See Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 679 (10th Cir. 1998) ("Arguments inadequately briefed in the opening brief are waived.").

The Prison Officials are entitled to qualified immunity on this claim because Grissom has failed to point to any clearly established law that would entitle him to relief based on the argument in his opening brief.

## V.      EIGHTH AMENDMENT

"[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks omitted). "The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones." *Id.* (citation and internal quotation marks omitted). "[P]rison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must take reasonable measures to guarantee the safety of the inmates." *Id.* (internal quotation marks omitted). Also, "[t]he unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment"; and "among unnecessary and wanton inflictions of pain are those that are totally without penological justification." *Hope v. Pelzer*, 536 U.S. 730, 737–38 (2002) (alterations and internal quotation marks omitted). But a prison official violates the Eighth Amendment only if the deprivation to which the prisoner has been subjected is "objectively sufficiently serious" and only if the prison official has a

18

"sufficiently culpable state of mind." *Farmer*, 511 U.S. at 834 (internal quotation marks omitted). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety." *Id.* (internal quotation marks omitted).

Grissom alleges he was subjected to cruel and unusual punishment because (1) 20 years in solitary created a substantial risk of serious harm, and (2) the defendants knew of but disregarded that harm. Pointing to various academic literature and government reports (both domestic and international), he appeals to us to recognize "[s]ociety's evolving standards of decency." Aplt. Br. at 13.

To overcome the defense of qualified immunity, however, Grissom must point to clearly established law. *See Thomson*, 584 F.3d at 1312. That, he has failed to do. He states, "A growing number of courts have concluded denying the basic human needs of social interaction and environmental stimulation can violate the Eighth Amendment, especially when the deprivation lasts for years." Aplt. Br. at 38–39. But the cited courts are four federal district courts, none from this circuit. That does not suffice to clearly establish the law. *See Toevs*, 685 F.3d at 916 ("Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains.")

Indeed, the most recent relevant decision by this court is an unpublished opinion rejecting an Eighth Amendment claim brought by a prisoner who had been in solitary confinement for 30 years under conditions not markedly different from those here. *See Silverstein v. Fed. Bureau of Prisons*, 559 F. App'x 739, 741 (10th Cir. 2014). We noted

19

that the prisoner in that case had "art supplies, reading materials, and multiple libraries; correspond[ed] with others; ha[d] access to radio, television, digital music channels, and closed circuit programming . . . ; [could] communicate with other inmates; and ha[d] indoor and outdoor recreation." *Id.* at 756. He also "ha[d] daily interaction, however limited, with a variety of prison staff." *Id.* We concluded that he "maintain[ed] a degree of social contact and environmental stimuli which . . . does not violate his Eighth Amendment right to be free from cruel and unusual punishment." *Id.* Grissom, similar to the prisoner in *Silverstein*, has regularly communicated with other inmates and staff and has been afforded regular exercise (including outdoor recreation) and regular access to reading materials and to medical and mental-health care.

We conclude that the Prison Officials are entitled to qualified immunity on this claim.

## VI.    CONCLUSION

We **AFFIRM** the district court's grant of summary judgment.

Entered for the Court

Harris L Hartz
Circuit Judge

20

17-3185, Grissom v. Roberts

**LUCERO**, J., concurring in the judgment.

I agree with my respected colleagues that our circuit precedents, particularly

Grissom v. Werholtz, 524 F. App'x 467, 474 (10th Cir. 2013) (unpublished) ("Grissom

II"), compel the outcome of this case.  Nothing has changed in our jurisprudence since

Grissom II that would mandate a different conclusion, and thus I join in the judgment

reached by the majority.  I write separately because it is important to establish that the

prolonged term of solitary confinement before us—twenty consecutive years—based on

what appears to be marginal justification, violates the Due Process Clause of the

Fourteenth Amendment of the United States Constitution.

During much of the twenty years Grissom spent in solitary confinement, he

received only rote repetition of the reason for his treatment.  Prison officials merely

indicated that the reason for his initial placement, suspected involvement in drug

trafficking, remained valid.  For half the time Grissom was subject to solitary

confinement, from 2005 to 2015, he had a single disciplinary report:  the control on a hot

pot in his cell was set too high.  I am disturbed by such flimsy rationale for the extension

of the duration of such a term in solitary confinement.

**I**

Assuredly, as the majority notes, Grissom is serving four consecutive life

sentences for three separate murder convictions.  He has no possibility of parole.

Grissom was placed in solitary confinement on August 4, 1996.  He did not return to the

general prison population until December 5, 2016.  Grissom spent more than seven

thousand days alone in a cell about the size of a parking space. That cell was constantly illuminated with florescent light. The solid metal doors were intended to block out any sights or sounds, and they remained closed at all times. The walls of his cell were required to be kept plain.

During those years, Grissom was permitted to leave his cell for one hour, five days per week, for solitary exercise in an eight-by-twenty foot cage. To participate in the exercise program, he was required to undergo a full strip search. In addition to the exercise program, he was granted three ten-minute showers each week. If a video booth happened to be available, he was allowed two one-hour video visitation sessions per week.

As my colleagues also correctly note, Grissom was placed in solitary confinement in 1996 for his alleged involvement in drug distribution. In 2003 and 2005 he was discovered with cell phones. And in 2015, he was found with other contraband. From 2005 to 2010, Grissom remained in solitary confinement without further disciplinary issues. In 2010, Grissom received a disciplinary report because a hot pot in his cell exceeded the authorized temperature. Grissom's reports reflect that his disciplinary and management history were "very good" between 2010 and 2015. In October of 2015, Grissom received a disciplinary report for passing a sexually explicit note to a female officer. In 2016, Grissom was placed in the Behavior Modification Program, and was later returned to general population. He remains there today.

Grissom seeks damages for having been kept in solitary confinement for twenty years on what he describes as "stale" and disproportionate justifications. Noting the

2

limited opportunities he had to leave his cell, the majority states that Grissom's argument paints an incomplete picture of his confinement. (Majority Op. 10.) The majority concludes that Grissom was able to communicate with other inmates through vents in his cell, place phone calls, and had the biweekly video visitations noted above. But what the majority fails to appreciate is that the fundamental parameters of his life remained the same. He lived in a cell designed to maximize sensory deprivation. He spent between 23 and 24 hours a day alone in that cell.

## II

Our society has long understood that extended periods of isolation take a significant toll on the human psyche. See In re Medley, 134 U.S. 160, 168 (1890) ("A considerable number of the prisoners fell, after even a short confinement, into a semi-fatuous condition, from which it was next to impossible to arouse them, and others became violently insane; others still, committed suicide; while those who stood the ordeal better were not generally reformed, and in most cases did not recover sufficient mental activity to be of any subsequent service to the community."); see also Norval Morris & David Rothman, eds., The Oxford History of the Prison: The Practice of Punishment in Western Society (Oxford University Press 1998) (charting the emergence of solitary confinement and providing discussion of the historical understanding of its risks through modern history). Amici—professors and practitioners of psychiatry, psychology, and medicine—tell us that such treatment results in profound injury.

Social interaction, environmental stimulation, and activity are basic human needs. Terry A. Kupers, Isolated Confinement: Effective Method for Behavior Change or

3

Punishment for Punishment's Sake?, The Routledge Handbook for Int'l Crime & Just. Stud., 213, 215-16 (Bruce A. Arrigo & Heather Y. Bersot, eds., 2014). Deprivation of these needs for an extended period causes severe and lasting consequences to mental and physical health. Jeffrey L. Metzner & Jamie Fellner, Solitary Confinement & Mental Illness in U.S. Prisons: A Challenge for Medical Ethics, 38 J. Am. Acad. Psychiatry & L. 104, 104 (2010) ("[I]solation can be as clinically distressing as physical torture.").

Physically, symptoms of extended solitary confinement include heart palpitations, headaches, hypertension, and weight loss. Peter Scharff Smith, The Effects of Solitary Confinement on Prison Inmates: A Brief History and Review of the Literature, 34 Crime & Just. 441, 488-93 (2006). Individuals subject to solitary confinement show significant changes in brain activity. Elizabeth Bennion, Banning the Bing: Why Extreme Solitary Confinement Is Cruel & Far Too Usual Punishment, 90 Ind. L.J. 741, 757-59 (2015) (summarizing documented changes in brain activity after solitary confinement); Stuart Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U. J.L. & Pol'y 325, 330-31 (2006) (observing abnormal brain patterns in people exposed to solitary confinement). In sum, solitary confinement rewires the prisoner's brain, physically changing the way the organ functions.

Psychologically, solitary confinement is devastating. Across various studies, individuals subjected to solitary confinement consistently become hyperreponsive to external stimuli. Grassian, Psychiatric Effects, 22 Wash. U. J.L. & Pol'y at 333-35. They experience distortions in perception, including visual and auditory hallucinations. Craig Haney, Mental Health Issues in Long-Term Solitary & "Supermax" Confinement,

4

49 Crime & Delinq. 124, 130-31 (2003).  They suffer from difficulties with concentration, memory, and coherent thinking.  Grassian, Psychiatric Effects, 22 Wash. U. J.L. & Pol'y at 335.  And they experience intrusive, obsessive thoughts and acute paranoia.  Id.  Additionally, they suffer from radically disturbed sleep patterns.  Haney, Mental Health Issues, 49 Crime & Delinq. at 130-31.

Many prisoners held in solitary experience loss of self-control, irritability, rage, and increased aggressive behavior.  Grassian, Psychiatric Effects, 22 Wash. U. J.L. & Pol'y at 336.  In one study conducted on prisoners confined indefinitely in a Maine prison's solitary unit, researchers observed frequent self-destructive behavior including "attempts to hang themselves, to light themselves on fire, or simply [] banging one's head on the wall."  Thomas B. Benjamin & Kenneth Lux, Solitary Confinement as Psychological Punishment, 13 Cal. W. L. Rev. 265, 277 (1977).  After being exposed to solitary for a significant period, prisoners "become increasingly unfamiliar and uncomfortable with social interaction."  Haney, Mental Health Issues, 49 Crime & Delinq. at 140.  Some withdraw from others entirely and eventually do not engage socially at all—even when given the opportunity to do so.  Craig Haney & Mona Lynch, Regulating Prisons of the Future: A Psychological Analysis of Supermax and Solitary Confinement, 23 N.Y.U. Rev. L. & Soc. Change 477, 567-68 (1997).

In short, solitary confinement, even over relatively short periods, renders prisoners physically sick and mentally ill.  It destroys any ability they may once have had to relate positively to others.  These harms, which are persistent and may become permanent, become more severe the longer a person is exposed to solitary confinement.  Haney,

5

Mental Health Issues, 49 Crime & Delinq. at 138-41. One study found that forty years after release, individuals exposed to prolonged isolation continued to experience psychiatric distress and detachment from others. Diana Arias & Christian Otto, NASA, Defining the Scope of Sensory Deprivation for Long Duration Space Missions, 43 (2011). Prisoners, like all human beings, adapt to their environment, and the longer they remain in an environment the more those adaptions are to change. Haney, Mental Health Issues, 49 Crime & Delinq. at 138-41. Given our society's present understanding that prolonged solitary confinement inflicts progressive brain injury, we cannot consider such prolonged, unjustified confinement as anything other than extreme and atypical.

## II

I acknowledge that prison officials must be afforded "appropriate deference and flexibility [in managing] a volatile environment." Sandin v. Conner, 515 U.S. 472, 482 (1995). Yet the judiciary retains the core responsibility of ensuring that executive officials comply with the Due Process Clause of the Fourteenth Amendment. In prison settings, officials must provide adequate procedural protections if they "impose[] atypical and significant hardship on [an] inmate in relation to the ordinary incidents of prison life." Wilkinson v. Austin, 545 U.S. 209, 223 (2005).

Our court has identified a non-comprehensive set of factors to consider in determining whether conditions qualify as atypical and significant. These factors include: whether (1) segregation relates to and furthers a legitimate penological interest, such as safety or rehabilitation; (2) conditions of placement are extreme; (3) placement increases the duration of confinement; and (4) placement is indeterminate. Estate of

6

DiMarco v. Wyo. Dep't of Corr., 473 F.3d 1334, 1342 (10th Cir. 2007). As the majority opinion recounts, this court ruled in 2013 that the DiMarco factors weighed against finding that Grissom possessed a protected liberty interest in avoiding solitary confinement. See Grissom II, 524 F. App'x at 474. As noted initially, I do not quarrel with the majority's conclusion that defendants are entitled to qualified immunity in light of that decision, albeit an unpublished order and judgment. Notwithstanding my agreement that Grissom II renders defendants immune in this case, I cannot agree with the Grissom II analysis.

The DiMarco factors were never intended to provide a static, formal test, and we cannot treat them as such. See DiMarco, 473 F.3d at 1342 (noting that "[i]t is simplistic to understand the Sandin formulation as suggesting a rigid either/or assessment" and thus "it makes sense to look at a few key factors, none dispositive"). In light of what we now know about the effects of prolonged solitary confinement, it is impossible not to conclude that two decades in solitary confinement "imposes an atypical and significant hardship under any plausible baseline." Wilkinson, 545 U.S. at 223.

There should be no serious doubt that the duration of Grissom's confinement in solitary renders it extreme. See Trujillo v. Williams, 465 F.3d 1210, 1225 (10th Cir. 2006) (if a "prisoner is subjected to a lengthy period of segregation, the duration of that confinement may itself be atypical and significant"); see also Wilkerson v. Goodwin, 774 F.3d 845, 858 (5th Cir. 2014) (listing cases in which courts have "considered the duration of the restrictions to be a central factor in the analysis"); Sealey v. Giltner, 197 F.3d 578, 586 (2d Cir. 1999) ("Both the conditions and their duration must be considered, since

especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical."). Grissom's conditions of confinement closely match those described in Wilkinson as atypical based in part on duration. 545 U.S. at 223. And they are similar to those described by Justice Kennedy as "exact[ing] a terrible price." Davis v. Ayala, 135 S. Ct. 2187, 2210 (2015) (Kennedy, J., concurring).

The third and fourth factors could be viewed as balanced. Grissom's placement will not increase the total duration of his sentence. See DiMarco, 473 F.3d at 1342. But his placement in solitary confinement was indeterminate. See id. I recognize that our court has discussed the availability of periodic reviews in considering whether a term of segregation is indeterminate. See id. at 1343-44; see also Rezaq v. Nalley, 677 F.3d 1001, 1016 (10th Cir. 2012). Regardless of the potential that a placement might end at some undefined time, the fact remains that Grissom's placement was for an indefinite and indeterminate period. See Wikinson, 545 U.S. at 224 (noting that placements were "indefinite" although subject to annual reviews).

At base, then, the question is whether the extreme nature of Grissom's confinement is justified by legitimate penological interests. See DiMarco, 473 F.3d at 1342; see also Rezaq, 677 F.3d at 1013 (we inquire as to a "reasonable relationship between segregated detention and legitimate penological interests and security concerns"). At the very least, Grissom has created a material dispute of fact on that issue.

Grissom was placed into solitary confinement because of his suspected involvement in drug distribution. He was labeled, in impenetrable bureaucratic speak, an

8

"Other Security Risk." But a non-violent disciplinary violation logically cannot provide indefinite justification for solitary confinement. "[T]he reason or reasons for the segregation must not only be valid at the outset but must continue to subsist during the period of the segregation." Kelly v. Brewer, 525 F.2d 394, 400 (8th Cir. 1975); see also Proctor v. LeClaire, 846 F.3d 597, 609 (2d Cir. 2017) ("The purpose of these periodic reviews is to ensure that the state's institutional interest justifying the deprivation of the confined inmate's liberty has not grown stale and that prison officials are not using Ad Seg as a pretext for indefinite confinement of an inmate." (quotation omitted)).

In 2013, when Grissom II examined whether there was a reasonable relationship between Grissom's isolation and the prison's interest in controlling his propensity for obtaining contraband, Grissom's last serious disciplinary violation had occurred eight years earlier. (He was also issued a violation in 2010 based on his hot pot exceeding the allowed temperature.) The record indicates that Grissom managed an unusually clear disciplinary record in the interim. In Grissom's reviews, prison officials noted that he "performed well," caused "no issues of concern," remarkably "maintained a positive and appropriate attitude," and posed "no management issues for security staff or unit team."

Grissom has also created a fact question as to whether he was given meaningful periodic reviews. See Toevs v. Reid, 685 F.3d 903, 912 (10th Cir. 2012) (a "review must be meaningful; it cannot be a sham or a pretext"); see also Isby v. Brown, 856 F.3d 508, 528 (7th Cir. 2017) (rejecting "the rote repetition of the same two boilerplate sentences following each review"); Proctor, 846 F.3d at 610 ("It is not sufficient for officials to go through the motions of nominally conducting a review meeting when they have

9

developed a pre-review conclusion that the inmate will be confined in Ad Seg no matter what the evidence shows."); Incumaa v. Stirling, 791 F.3d 517, 534 (4th Cir. 2015) ("The ICC has merely rubber-stamped Appellant's incarceration in [solitary confinement] (figuratively and sometimes literally), listing in rote repetition the same justification every 30 days . . . .").

For years, Grissom's review forms merely referenced "placement facts" as a basis for continued detention. His reviews lasted one or two minutes. Grissom repeatedly requested guidance as to any steps he might take to return to the general population but was given no useful information. Perhaps most damningly, eight consecutive reviews included the same awkward syntax, providing only one reason for the recommendation to keep Grissom locked in solitary confinement after nineteen years: "Retain; Placement facts still apply." Such a denial of meaningful consideration contravenes our bar on prison officials "relying on a meaningless, repetitive, and rote response." Toevs, 685 F.3d at 913-14.

Given the severe consequences of long-term placement in solitary confinement, such conditions must be treated as a last resort, used in only the most extreme of cases. And even then, prison officials must meaningfully consider on a periodic basis whether solitary remains necessary. There appears to be no evidence of proportionality between the prison's interest in confining Grissom and the length of his solitary confinement. A factfinder could certainly determine that the reviews he received were inconsistent with the Fourteenth Amendment's demand for due process.

## III

For the foregoing reasons, I am compelled to conclude that the decision in Grissom II, in which Grissom was before us as an indigent without the benefit of counsel, incorrectly analyzed the DiMarco factors. The injustice that error has wrought—to wit, Grissom's twenty years of unjustified solitary confinement—is severe. But for our unpublished order and judgment in Grissom II, I would conclude that the appellant has shown, under clearly established law and the facts presented in this appeal, that the twenty years he was forced to spend in solitary confinement violated his due process rights.